Thank you very much. All right, we'll proceed to the next case on the calendar, the last one for today, which is Austin Braun v. Andrew Saul. And we have Mr. Seidlitz again. Thank you, Your Honors. My name is John Seidlitz. I have the privilege to represent Austin Braun today. Austin is a social security disability case, different case. It's a termination case. Austin was awarded benefits as a child, and then at 18, they did their review and decided in January of 2014, he was no longer disabled. Went through the administrative process, we had the administrative hearing, and the administrative law judge, same as the one I argued this morning, found that he was no longer disabled. The ALJ found his impairment at the time of the hearing included and continued to include the childhood impairments of attention deficit hyperactive disorder, organic brain syndrome, speech and language delays, and anxiety. Now, what happens is the conditions do not change. I don't think there's any argument, legitimate argument, that the impairments from childhood changed. He no longer met the childhood listing because he's an adult, but the impairments didn't change. Now, the issue involves whether the ALJ had sufficient facts to justify finding that there was an improvement in his condition. And one of the problems Austin has, one of the problems I have standing here in front of you arguing is, Austin likes to say he can do lots. Austin can do everything. Austin is DJing. Scared me when I read that, when the judge pointed that out and said, that's why she's going to deny it, because he's doing DJing. And you picture the crowds of kids dancing and the person up in the front spinning the, he won a DJ contest. My goodness, he must be good. Everything he did on DJing is online. He's on computer. So he's on computer and he's doing a mix of music, and he may have some capacity to recognize good music or put it together in a good fashion, but his activities have been online. If he has done any DJing in terms of social activities, it's all been volunteer. He's never made any money at it. Nobody said, you're good enough, I'm going to pay you to do this thing. So one of the arguments we have is, when the judge found he's not as limited as he says he is because he can do these activities, she errs when she finds that because he can be a DJ, he can go out and socialize and do things. Most of the items she identifies involves online. He dates online. He can use a computer. There's no doubt about it. He has an organic brain syndrome. The kid is slow. There's no denying that. He has emotional and cognitive limits. But he has repeatedly taken advantage of. It's uncontested. Somebody comes along and says, you can make a lot of money selling this item. I don't remember, something about $5,000 you can make selling these items. You just got to pay $500 to be a salesman. And so he does it because it sounds great. He gets called. His grandmother, who is the person who watches out for him, gets the money back. The same guy comes back to him and says, hey, but I need $100. Will you give me $100? And he does, just because he can be taken advantage of. Social media. She points out that he can do social media, therefore he's not limited. Again, it's all online activities. The description that I think most evidence is. I hear what you're saying, but there's also the opportunity to work online. So you don't end it when you say he's online, do you? Well, I think you'd be absolutely accurate if the judge had posed that as a limitation to the vocational consultant and say, when you've got this child or 19-year-old who has these activities, if I'm going to put him in a spot where he doesn't have to be The problem is the ALJ said, you know, he can occasionally be exposed to the public. He can occasionally be exposed to coworkers. No, I'm just talking to your online argument. Amazon.com is online. I understand. Oh, you can name a million companies, never have contact with the public. They don't even know who the public is. I exactly understand. So when you say online, you haven't solved your client's problem because online doesn't mean a thing. So you tell us another reason why. Well, the reason is the judge said he could spend a third of his day being with other people. He could spend a third of his day working with the public. And here's a kid who gets conned. He gets conned by everybody. He's taken advantage of. He doesn't have that capacity. If legitimately he had some capacity to do something online, and I, after all these years, the one thing I have absolutely no confidence in is vocational rehabilitation. I don't know what jobs are out there, and I question vocational experts to try to figure out what is it that this person I'm representing is supposed to be able to do. And I would have been interested in the answer to that question here, to see if the judge had given him the limits that included his mental limitations and said, I want you to limit the jobs you're looking at to online. I'd have really been interested in that because maybe there is something he could have done. I don't know. One of the things that the judge does when, that I think is a critical error in the speculation that has happened in his case, in Austin's case, is she says he went to culinary school. That shows you he can be out in the public. He can do things in the public even though he claims he can't. Here's this kid getting out of high school. He's going to graduate from high school. He's got all the special SEPs, IEPs, whatever they give him to help him get through. They have coaxed him through. He's now, he's got job coaches. Job coaches that not, I've had the job coach where they come in and they tell you, okay, he could do this job and do some things. This job coach is in the facility at Pizza Hut, or excuse me, shouldn't say that, at the pizza place where he's washing dishes, and the coach has to be on site to help him. I mean, that's how much help the job records show that he needs to do. But the ALJ said he went to culinary school. He went to culinary school. That shows he can learn, he can be in the public, and he can go out and accomplish things. What they did was, it's either the life skill coach or the job coaches, because he had a lot of help going through. They're trying to teach him to be independent. They're trying to teach him how to cook for himself. And so, and I made notes of it, I don't want to misrepresent it, but it's like, he can make a sandwich, he can cook a burger, and he learns how to make a TV dinner. That's what they taught him. Now, that's a long jump from there to culinary school. Culinary school means you've got skills, especially if you've passed, and he said he finished it, that he's got skills. He can work. He can cook. He can, you know, people hire good cooks. I mean, everybody, I shouldn't say everybody. I appreciate good cooks. I'm not a cook. So, I'm looking at that as, that's a really good job skill. But the judge jumped a huge distance from he completed culinary school to he finished a life skills class, where he learned how to turn on a stove, shut it off, and not burn the place down. In terms of his limitations, his cognitive problems, which there's no evidence that they improved, were affirmed by the medical provider, Maxwell. And she's ignored. She has said, I have treated him. She treated him from 2012 to 2015. Throughout that time, it's noted, not in her record, it's noted, throughout that time, the life skill coach has to come in and fill out his weekly prescription medication deal, those little seven deals. Every week they have to come check on it. One week out of five, this kid has the ability to go through his medications and lay them out in the weekly deal. Twice out of five times, they indicated he filled his prescriptions. The guy can't even get that done. But Maxwell says about him, I've treated him three years now. We've had him on two psychotropic medications. Between prescription medications and behavioral management, it's only marginally effective. It's not able to consistently work. One of the reasons for that is, he's not taking his medications. He doesn't set them up. He doesn't take them. Some guy, acquaintance, friend, I don't know, comes along and says, you shouldn't take those mental health medications. They're bad for you. And he quits. He quits. I mean, anybody that comes along takes advantage of this poor kid. His concern with the medications is expressed when he goes to the doc and says, you know, the medications keep me from gaining weight. It's a speed medication. And so they don't eat, they're not hungry. And she's saying, no, no, if you just eat normal, you won't keep losing weight on this. So keep trying it. But there's no evidence that the evidence is the medications will work if you can get him into his body and somebody watches and follows along and says, take these. Listening to you, I sometimes wonder if we're talking about the same person. The evidence here seems that Brown has had multiple jobs. He's at Papa John's making pizza. He's worked up to 35 to 42 hours a week. Are we talking about the same person? Talking about a person who's only had part-time jobs. And I don't know if any of the jobs ever lasted more than a month or two. He loses all of them. No, no, no. He chose to leave the jobs of his own accord. He found that the job at the pizza place washing dishes was too fast paced for him. He could not keep up with the requirements. That's what the record is. He couldn't keep up with washing dishes. Threw up his hands. I just can't keep up. And that's in spite of job coaches coming along and trying to help him. They're in the job site. They're on the job site. So I don't think he's ever had a full-time job. And if it is, it's never lasted more than a month. And if I can, unless there's questions, I'd like to reserve the last bit of my time. Thank you. Thank you. Your Honors, good morning. Joseph Lancomer on behalf of the Commissioner. Judge Bea, picking up on your point, the record does tell a much different story than what Mr. Braun argues his limitations are. Mr. Braun is alleging that he cannot work because he has problems with social interaction. He just walks off the job. He has a hard time with time management. He can't remember anything. But the medical records in this case demonstrated that medication improved his symptoms. For example, this is in November of 2015, a treating doctor, Dr. Myers, saw Braun, Braun to establish care. And this is what Dr. Myers wrote. And this is on page 692 of the record. Austin is doing extremely well and is very stable on current medication. That was two months before the ALJ's hearing in this case. We also have a lot of activities in this case that, despite some issues, keeping up with some of the activities, they show that Mr. Braun was a lot more functional than he alleged. And under this court's Molina precedent, that is relevant for the ALJ to consider. Today, Mr. Braun argued a lot about the fact that he did all of these things online. The record actually shows that, for example, with respect to his DJing activities, he did, in fact, get DJ gigs scheduled around town. Pages 585, 601, 603, 652, they all reference him actually going places, selling tickets, having DJ gigs online, beyond just the online music mixing that he was doing. And I would point out, even to Judge Ferris's point, even the online activities that he was doing with respect to the DJing undermine his allegations that he does not retain the mental, functional capacity to do any work. They demonstrate that he has to retain that, the ability to concentrate, even if it is online only. With respect to his allegations about being too socially limited to interact with other people, well, he kept busy with a church group, which the ALJ relied on. For example, he actually went on several mission trips with this group. He traveled internationally to Belize at one point to build houses with this group. He was doing ticket-taking at MSU at one point. It is true that the culinary class was in the form of a life skills class after Mr. Braun graduated from high school, but nevertheless, he did acquire cooking skills, and the evidence does show it was a 16-week course. He actually, Mr. Braun even considered focusing on developing his cooking in the workplace, for example, at page 489, there's reference to him wanting to use the cooking skills that he gained during that course. So the activities that Mr. Braun performed undermined his allegations that his mental impairments prevented him from doing any work. With respect to Mr. Braun's argument about his job coaching in the past, Judge Bey, you pointed out that he had past work. He certainly did, and in fact he did very well at some of those jobs. At the time of the hearing, he had a job at Staples, office supply store, where he was interacting with the public. He had a job coach, but at the same time he was doing semi-skilled work dealing with the public, and he reported that it was going very well, and Staples was happy with his performance. How many hours a week did he work at that job? It was part-time. I think it was, I don't know the specific number, it was less than 40. It was maybe half of that, I would say, somewhere around 20 hours. There was indication, he has not had full-time work. These jobs have been part-time. But there is indication in the record that he was looking for more hours with some of these jobs. I think Come On In was a place where he worked, he was doing laundry service there. He was hoping to get more hours and had expressed frustration that he wasn't getting more hours, which was why he ended up moving on from that job and looking for something else. There is evidence that he encountered some difficulties at some of these jobs. You know, he did have some incidents where he, as he pointed out this morning, he was falling behind with, like, the dishwashing job, the pace was a little bit too quick. But the ALJ actually accounted for that in the RFC on page 54 of the administrative record. This is the ALJ's decision, and this is how the ALJ accounted for that. He can tolerate only occasional changes in routine work setting, should not be required to make more than occasional decisions and judgments. Additionally, he cannot perform at a fixed production rate or pace. So, yes, he had some issues in the past. These were different jobs. These were jobs that, with this residual functional capacity, he may not be able to perform. But with this residual functional capacity, when the ALJ posed this hypothetical RFC to the vocational expert, the vocational expert said, yes, there are lower skilled jobs in the economy that an individual with that RFC could perform. And the examples of those jobs were window cleaner, garbage collector, and a dresser. Those were the jobs that the vocational expert identified. And those are jobs that require, that are not the same jobs that he had done in the past, the part-time work where he was using a job coach. With respect to Ms. Maxwell's opinion, that's the nurse that treated Mr. Braun for several years. Ms. Maxwell, under the agency's regulations, was an other source, a non-acceptable medical source. So in those cases, as the Court's Bayless case makes clear, the ALJ can discount those opinions if there are only germane reasons, which is a low standard. And the ALJ provided a reason here, and that's that Ms. Maxwell, despite her treatment history, which is a relevant consideration, the ALJ acknowledged that. But Ms. Maxwell's opinion did not align with the overall treatment record with records that demonstrated, beyond Ms. Maxwell's own records, with records that demonstrated that medication helped. And that when Mr. Braun was taking his medication, he was, for example, in July 2015, he seemed, quote, more focused and is more productive with medication. This is Ms. Maxwell's own note in August of 2015. Braun reported that he had positive effects, as usual, I am doing really well. His grandmother, who was talking about all the difficulties that she had with him going out late and playing his music loud and having to monitor some of his activities and helping him with his daily activities, on page 470 to 71, this is in the spring of 2015, she too confirmed that medication was helping him. Page 887, we see the same thing. And again, in November 2015, which was just a couple of months before the ALJ's hearing in this case, Dr. Myers visited with Mr. Braun and said he is doing extremely well and he's very stable on current medication. So the ALJ looked at that longitudinal record and said, Ms. Maxwell's opinion, despite the treatment history, does not align with what I'm seeing here. And while I am limiting Mr. Braun pretty significantly in the RFC to just occasional public interaction, which is very little, up to one-third of the day, no working in tandem with coworkers, unskilled jobs requiring just basically routine changes in the workplace, the ALJ found that that RFC comported with the record better than what Ms. Maxwell noted, which was that he just can't do anything and he won't be able to work with these limitations. Let me ask you this. Did the ALJ have any opinion as to why Mr. Braun occasionally stopped taking his medication? The ALJ did not, I don't believe, made a note about that, but Mr. Braun, it demonstrated that when Mr. Braun, what the ALJ did find, that when Mr. Braun was taking his medication, he was doing well. Your learned friend proposes that Mr. Braun is so gullible and has such a pliant personality that whoever wishes can con him, in this phrase. Doesn't that affect his ability to keep taking his medication? That's the argument, that he cannot, that he's gullible, and I think there was one occasion where somebody mentioned, well, you shouldn't take this medication. The overall record shows that Mr. Braun is more functional than that. So in addition to just the fact that sometimes he is missing his medication, there are multiple treatment records also that show that he has a normal mood, he has no unusual thought content, thought processes were logical and coherent, and judging from his activities, which involve maintaining an active DJ hobby, for example, he even had a DJ segment on a radio show at some point, keeping busy with his church group, doing ticket taking at MSU, he reported that he had problems with his self-care, demonstrate that he is not, he's not as severely limited as he's alleging, and I would point out the RFC in this case takes into account the fact that Mr. Braun does occasionally have judgment issues. There were several judgment issues that Mr. Braun identified in the brief, but what the ALJ found was that, for example, he can carry out only unskilled tasks, he can maintain concentration, persistence and pace for those tasks, just occasional interaction with the public, which, again, as it's defined, is very little up to one-third. So to the extent he may be having issues with, hey, you know, if you do this, this will happen, to the extent he has some impaired judgment there, the ALJ is limiting him to only occasional interaction with the public, cannot work directly with the public as part of his work duties, only occasional interaction with coworkers, but cannot work in tandem. And here's a key. He can tolerate only occasional changes in a routine work setting, and should not be required to make more than occasional decisions and judgments for these unskilled tasks. So the ALJ is acknowledging that there are some judgment issues, he's not taking his medication all the time, he is susceptible to lapses in judgment, the ALJ recognizes all that, but then incorporates those limitations into the RFC and then finds, based on the vocational expert testimony, that there are jobs that such a person could perform in the national economy. So to the extent the Court has no further questions, substantial evidence supports this ALJ's decision, the Commissioner requests the Court to affirm. I'd like to thank the Court for the opportunity to come out and address the Court on these cases today. In Austin Braun, in addressing the issues Council has raised for the Court, one of the things that's critical is, in going through the briefs and the records, is there is no job this kid does without a job coach. He's got a job coach at everything, and that's not in the RFC. There's never a time he's doing more than part-time, and that doesn't even last months. He just doesn't get through, he cannot keep a job. There's a reference in the briefing about how gullible this poor guy is. July of 13, an online record company from Romania offered him a contract to come in. Big money's going to be made promoting this online. When the case manager comes in to say, Austin, you're getting conned. I mean, Austin, let's look at this thing. He dropped the idea. Austin's never wanted to quit, though, because then he picks up on the idea of traveling from where he's at, which is quite a ways outside of Missoula. Somebody in Missoula offers him a DJ gig. Come to Missoula, do DJs. Oh, yes, I'm going to do it, and he says he's going to do it. Somebody says, have you got a way to get to Missoula? Well, no, no, no, I'll deal with that later. Finally, in the end, he gives it up. I just, okay, I can't do it. Come to find out, the gig is in a bar, and he's less than 21. He couldn't have done the gig if he'd have got there. Those are the kinds of things that he just can't seem to grasp, because he's not going to say no. He's going to keep trying to do jobs. There are references throughout that all of his activities require assistance. Everything requires assistance. As of the time of the hearing, Grandma has finally taken over the medication distribution to try to keep him on. I think it is, in fact, the case that if you keep him medicated and he focuses, he does lots better. But there's no evidence that he's ever been able to accomplish anything without a job coach and a life skills coach, and those were not part of the RFC. Thank you, Your Honors. The case of Brown v. Saul will be submitted, and the Court thanks counsel for their argument. We will stand adjourned until 9 o'clock tomorrow morning.
judges: Farris, Bea, Christen